IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 13, 2025

## LEAVY L. JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-116     Khadija Lanice Babb, Judge**

_____

### No. M2024-01401-CCA-R3-PC

_____

The petitioner, Leavy L. Johnson, appeals the denial of his petition for post-conviction relief, arguing the post-conviction court erred in finding he received the effective assistance of counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Leavy L. Johnson, Nashville, Tennessee, Pro Se (on appeal); Erin Coleman, Nashville, Tennessee (at the hearing), for the appellant, Leavy L. Johnson.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

On February 28, 2020, the petitioner was convicted at a bench trial of one count of rape for which he received a sentence of eight years. The petitioner appealed his conviction. On December 17, 2021, this Court affirmed that conviction, and the Tennessee Supreme Court denied his application for permission to appeal. *See State v. Johnson*, No. M2020-01443-CCA-R3-CD, 2021 WL 5984939 (Tenn. Crim. App. Nov. 9, 2021), *perm. app. denied* (Tenn. Apr. 13, 2022).

The facts giving rise to the petitioner's conviction were summarized by this Court on direct appeal as follows[1]:

McKenzie Overstreet testified that she and the victim were friends and went to a concert together on August 14, 2016, at Bridgestone. Ms. Overstreet said that she, the victim, and the victim's friend, Laura Perry, took an Uber to Bridgestone for the concert. She recalled that, when they arrived, they found their seats, and then she and the victim went to the restroom. Ms. Overstreet explained that she and the victim found a Bridgestone employee, [petitioner], near the restroom and asked him if they could get better seats because it was Ms. Overstreet's birthday. Ms. Overstreet said that [petitioner] first declined but then said, "Well let me go ask." When [petitioner] returned, he said that he could get closer seats for them if they "tipped" him $500.

Ms. Overstreet left the victim with [petitioner] and went around the arena to an ATM to get cash for [petitioner]. When Ms. Overstreet returned to the victim's last known location "five or ten minutes" later, the victim and [petitioner] were gone. Ms. Overstreet testified that she began searching for the victim and calling and texting her. About fifteen to twenty-five minutes later, Ms. Overstreet finally found the victim near the vendors and asked the victim where she had been. Ms. Overstreet recalled,

[I]t wasn't until she looked up at me, I mean, just tears rolling down her face. I quickly approached her and asked her what was wrong, and she told me she had been sexually assaulted, and I quickly grabbed the nearest officer that I could find, who was not too far behind me, and I told him what had happened and they handled it from there.

Ms. Overstreet explained that she and victim went with the officers to answer some questions and that she and the victim were then transported to the hospital for the victim to have a "rape kit." She said that the victim was crying "a lot" and "was just beside herself."

On cross-examination, Ms. Overstreet stated that she, Ms. Perry, and the victim had one glass of wine before they left for the concert. She recalled that, when they arrived at Bridgestone, the victim had "a couple of beers." Ms. Overstreet stated that, when [petitioner] initially refused their request,

---

[1] We limit our recitation of the facts to those relevant to the petitioner's issues on appeal.

either she or the victim said, "Hey, its [Ms. Overstreet's] birthday, is there any way we can get closer or backstage? [Ms. Overstreet] named her dog after [the performer]." Ms. Overstreet denied that the victim was affectionate with or "hugging on" [petitioner].

The victim testified that, prior to August 14, 2016, she did not know [petitioner]. She said that she flew in from Evansville, Indiana, that day to attend the concert with her friends. She recalled that, while she was at Ms. Perry's house waiting for Ms. Overstreet to arrive, she had a "Corona" and some snacks. The victim explained that, once they arrived at Bridgestone for the concert, she purchased two beers and drank one of them. She said that, after the opening acts, there was an intermission before the main performer began, so she and Ms. Overstreet went to the restroom. She recalled that Ms. Overstreet wanted to meet the performer, so they stopped the first Bridgestone employee they found, [petitioner], to ask about going backstage. The victim said that she knew [petitioner] was a Bridgestone employee because of his uniform. [Petitioner] told the victim and Ms. Overstreet that he might be able to get them into an "after party" and that he told them to wait while he asked. When [petitioner] returned, he told the victim and Ms. Overstreet that he could get them backstage for $500.

The victim explained that, when Ms. Overstreet went to the ATM to get $500, the victim waited with [petitioner] because Ms. Overstreet did not want them to get separated from [petitioner]. The victim then explained,

> [T]hen I don't remember anything but walking towards another black curtain, him saying like "This is . . . where you're gonna meet [the performer], . . . your friend is behind us." And then after, I remember opening the black curtain and then once we went in, I remember feeling somebody just like pushing me towards the ground. I hit my elbow on something, I'm assuming the seats or the floor, and then I remember just kind of going in and out of consciousness and just feeling like a force on my left leg and being held down on my wrists, and then I remember I could kind of hear the music, like [the performer] was on stage, so I could hear him, he was performing already. And then the next thing I remember being pulled up and him yelling, telling me to get up, and I was crying at that point, and he kept saying, you know, "I'm sorry, I'm sorry, be quiet." And as he was – I started screaming "What did you do to me? What did you do to me," because at this

point my underwear and my pants were around my ankles, and he took off and ran out the black curtain to the right-hand side of that section, so he went right. And I waited, pulled up my undergarments and my pants and waited there for a second just because I didn't know if he was still outside behind that black curtain.

The victim explained that it was "pretty dark" behind the curtain but that no one else was there besides [petitioner] and her. She said that, when [petitioner] held her down, he used his right hand and right leg. The victim said [petitioner] took her pants and underwear off while he held her down. She stated that [petitioner] put his penis inside her vagina and that he did not use a condom. The victim recalled trying to "grab at him" and telling him to "stop." The victim said that there was not "any doubt in [her] mind" that what [petitioner] did to her was "without [her] consent" and that [petitioner] inserted his penis into her vagina "by force."

The victim explained that, after the assault, she felt pain in her abdomen, head, and elbow, and that she started walking around "kind of out of it." She saw the vendor tables, so she approached them to get assistance. Ms. Overstreet then found her near the vendors. She said that Ms. Overstreet pulled someone over and asked for assistance.

. . . .

Pamela Crues testified as an expert in medical legal examination that she worked at Nashville General Hospital as an emergency room provider and as the Medical Legal Exam Team Manager. She said that she did not examine the victim after the incident but that the nurse who did was no longer available. Ms. Crues reviewed the victim's medical legal exam report. She explained that, although the report indicated that the victim had no physical trauma, a lack of trauma was not inconsistent with a rape victim. She explained, "most sexual assault victims do not have any trauma, and that's pretty standard. I've personally done around 700 sexual assault exams, and maybe only about five to ten percent of victims ever have trauma in the vaginal area." Ms. Crues continued, "[W]omen do have babies, and so the vagina is very accommodating. So, if you think about the vagina can expand enough to let an infant's head and shoulders come through, a penis, I mean, it might cause some trauma, but most of the time it doesn't." She testified that, as part of the examination, the victim had several swabs taken, as well as urine and blood tests for pregnancy, blood alcohol level, and disease. Ms.

- 4 -

Crues noted that the victim said "that there was only vaginal penetration" and that [petitioner] tried to kiss her on the mouth and neck.

On cross-examination, Ms. Crues agreed that the absence of physical trauma did not "indicate anything one way or another." She agreed that the physical examination only established that sexual contact had occurred and not whether it was consensual.

On redirect examination, Ms. Crues agreed that the victim's statements memorialized in the report described a "non-consensual sexual act."

. . . .

[Petitioner] testified that he managed concession stands at Bridgestone in August 2016. He said that, on August 14, 2016, the victim and Ms. Overstreet approached him, told him that it was Ms. Overstreet's birthday, and asked to go backstage. He stated that he told the women that he would not be able to get them backstage but that they persisted, telling him he was "someone of importance" and that they would "do anything." [Petitioner] said that Ms. Overstreet offered to give him $500 and that the victim was "caressing [his] arm and [his] shoulder while [he was] standing there." [Petitioner] recalled, "[A]t that point, like I said[,] 'I can get you close maybe.' " [Petitioner] said that he did not have the authority to get anyone backstage to meet the performer but that he might have been able to get them closer seats "behind the stage." [Petitioner] continued, "But [Ms. Overstreet] was like 'We'll give you $500,' and then she looked at [the victim] and said, 'Would you -- would you f*ck him[?]'"

[Petitioner] testified that the victim started "kissing on [his] neck" and gave [petitioner] her phone number. He said that he went down near the stage to look for the "person [he] knew" who would let the women sit closer to the stage. The person he knew was there, so [petitioner] returned to the victim and Ms. Overstreet. [Petitioner] said that he asked Ms. Overstreet to get the $500, and Ms. Overstreet asked the victim, "Are you going to have sex with him?"

[Petitioner] said that Ms. Overstreet went to the ATM, and the victim started kissing [petitioner] and "grabbed [him]" in his "private area." He recalled, "[the victim] said 'Do you want to be over on this side? Do you want to be right here?'" [Petitioner] said that he responded by taking her to a curtained area. He explained, "I knew what she was talking about because

her friend obviously said, 'Are you gonna f*ck him,' so when she said that, I knew what she was talking about. . . . I knew she wanted, basically she wanted to have sex." [Petitioner] stated that the victim did "not at all" seem inebriated.

[Petitioner] said that, once they were behind the curtained area, the victim put her hand down his pants and took his hand and put it down her pants. He said that they sat on the steps and that the victim unbuttoned and unzipped his pants. [Petitioner] stated that the victim took one leg out of her pants. He said that he "had sex" with the victim for "three or four minutes" and that she never cried, kicked, scratched, or asked him to stop. [Petitioner] stated that he had seven daughters and that he would "never take someone's innocence." [Petitioner] said that the victim never lost consciousness.

[Petitioner] said that, after they finished "having sex," they got dressed and that he told the victim he would try to get them close to the stage. He stated that the victim was upset because she expected to go backstage to meet the performer. He said, "When we walk[ed] back from behind the curtains, I said, 'Well, hey, if you go to the left, I will meet y'all back where I met you at.'" [Petitioner] said that he finished checking on his concession stands and then checked to see if he could still get them close to the stage. He stated that he could not find the two women, so he called the victim's phone. [Petitioner] said that the victim never answered her phone, so he finished his shift and went home about 10:30.

. . . .

The trial court stated that it "considered all the testimony in this matter and thought it through carefully[.]" The court found [petitioner] guilty of rape.

*Id.* at *1-7.

Following the denial of his direct appeal, the petitioner filed a pro se petition for post-conviction relief on January 28, 2022. On February 17, 2022, counsel was appointed, and on March 26, 2024, an amended petition for post-conviction relief was filed. In his amended petition, the petitioner argued that his right to a jury trial was violated as his waiver was not made knowingly or intelligently. Additionally, the petitioner claimed his right to the effective assistance of counsel was violated because trial counsel failed (1) to investigate potential witnesses; (2) to challenge the qualifications of the State's expert witness; (3) to object to the State's expert's testimony on the ultimate issue; (4) to challenge the authenticity of the SART ("rape") kit; and (5) to impeach the testimony of a witness.

- 6 -

An evidentiary hearing was held on April 30, 2024, during which several witnesses, including the petitioner and trial counsel, testified.[2]

The petitioner testified that it was "straight from the beginning" that trial counsel began discussing the idea of a bench trial. The petitioner claimed that he initially refused the idea; however, he began to feel coerced into a bench trial by both his trial counsel and a private investigator working on his case, Mr. Mason.[3] Despite being uncomfortable with the bench trial, the petitioner ultimately "acquiesced" out of necessity. The petitioner alleged that he needed to leave town for an elective surgical procedure, but trial counsel had told him that he "couldn't go out of town unless [he] basically signed – signed this waiver basically that I would have a consensual bench trial. And then the Judge would grant me permission to go out of town to have surgery." The petitioner, therefore, claimed that his decision to have a bench trial was not something he made willingly.

The petitioner testified that he told trial counsel and Mr. Mason, in a meeting approximately a week before trial, "I didn't want a bench trial." But he was told by Mr. Mason, "why even have a lawyer if you're not going to listen to him?" The petitioner also recounted a meeting in which trial counsel explained the advantages of a bench trial in cases in which a victim might cry on the stand. The petitioner continued, "[s]o I went forward with the bench trial on the fact that I was listening to [trial counsel] on which I was uncomfortable with."

Regarding the State's expert witness[4], Ms. Crues, the petitioner testified that trial counsel did not cross-examine Ms. Crues "in depth" and that he wished trial counsel had been able to elicit "that her opinion [was] that maybe this woman wasn't raped, that it was – that it was consensual." The petitioner continued, "I would have loved the fact if he could have got her to admit that." The petitioner agreed, however, that Ms. Crues would not know whether it was consensual or not, and that trial counsel effectively cross-examined her on that point. Additionally, the petitioner stated that while trial counsel "could have done something more" to disqualify Ms. Crues as an expert, he did not dispute her qualifications as an expert witness. The petitioner, likewise, could not identify any evidence contained within the rape kit that damaged the defense's theory of the case that the sex was consensual, but he wanted trial counsel to challenge its authenticity regardless. The petitioner also testified there were additional witnesses trial counsel should have investigated, Ms. Overstreet's brother and his girlfriend. The petitioner claimed that they

---

[2] We limit our recitation of the testimony at the evidentiary hearing to that relevant to the petitioner's issues on appeal.

[3] At the evidentiary hearing, the petitioner misidentified the private investigator as Mr. White. The record reflects that his name was Tim Mason. Because Mr. Mason also testified at the evidentiary hearing, his correct name is used throughout.

[4] Ms. Crues was qualified as an expert in medical legal examination.

were present at the arena "at one point in time." While the petitioner agreed he did not know how they would have testified, he claimed that they were present when the victim was making sexual advances towards him by "kissing and rubbing all over [him]."

Tom Mason, an investigator hired by trial counsel, also testified at the evidentiary hearing. Mr. Mason testified that the decision between a bench or jury trial was discussed "at length" with the petitioner. "We gave him the pros and the cons of a jury trial or a bench trial." Mr. Mason further testified that he did not recall the petitioner being coerced into having a bench trial and described the petitioner's response as, "I don't know that I would call it reluctance as much as not understanding the difference between the outcome of either one of them." On cross-examination, Mr. Mason clarified that the petitioner's misunderstanding of the two options existed in the beginning, but "we discussed at great length the pros and cons." Mr. Mason recounted, "every conversation we had ended with but it's your decision, if you want to go to trial." Ultimately, discussing the advantages and disadvantages of a bench trial, Mr. Mason had "no doubt at all" that the petitioner understood the difference between the two.

Trial counsel testified that he was appointed to the petitioner's case in approximately May of 2017. According to trial counsel, he met with the petitioner and his family early on during his representation in order to file a "Motion to Reduce Bond." Once petitioner posted his bond, trial counsel and petitioner met repeatedly in preparation of his case. Trial counsel described his relationship with the petitioner as amicable with "good communication."

Regarding the discussions of a bench trial, trial counsel testified that he educates every client as to the possible outcomes of their case including bench trials. He saves strategic discussions about those options until they are "close to setting the case for trial." In this case, trial counsel advised the petitioner that the trial judge's background as a former defense attorney would make him "less reactive to things like crying" and that "judges can keep their eye on the evidence as opposed to getting lost in kind of emotions." Trial counsel made it clear to the petitioner that it was the petitioner's decision and that he did not coerce or force the petitioner to choose a bench trial. He testified, "[i]t was completely up to [petitioner]."

Regarding the State's expert witness, Ms. Crues, trial counsel testified that he knew Ms. Crues had previously testified as an expert witness in the trial court. He also stated that he objected during her trial testimony when she was asked whether the evidence was consistent with rape, but he was overruled by the trial court. Trial counsel testified, "I objected to try to make clear that there is no way of knowing." Additionally, he would have felt like an "absolute idiot" to have argued that "this rape kit is bogus" by challenging the authenticity of the kit. He testified that the only thing he could have achieved was

acknowledgement that neither the expert nor the kit offered evidence that the victim was raped. He stated that to argue, "this sex didn't happen and then a few witnesses later . . . it happened, but it was consensual. That's idiotic." Concerning his cross-examination of Ms. Overstreet, trial counsel testified that he chose not to impeach her concerning an inconsistent statement about driving the victim to the hospital because "that doesn't really, to me, carry any weight on what actually happened."

After reviewing the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner argues that he was deprived of his right to a trial by jury and that trial counsel was ineffective for failing to (1) investigate potential witnesses; (2) challenge the qualification of State's expert witness; (3) object to a State's witness's testimony on the ultimate issue; (4) challenge the authenticity of the rape kit; and (5) impeach the testimony of a witness. The State responds that the post-conviction court properly found that trial counsel was not deficient and that the petitioner suffered no prejudice.

### I.    Waiver of Right to Trial by Jury

The petitioner contends that he was denied his right to trial by jury because his waiver was not voluntary and was given unintelligently. The State contends the petitioner waived this issue by failing to raise it on direct appeal. "It is well established that a party may not raise an issue in a post-conviction petition that could have been raised on direct appeal." *State v. Townes*, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355 (Tenn. 2003). However, the issue of whether the petitioner's waiver of his right to a jury trial was influenced by ineffective assistance of counsel was argued at the hearing without objection by the State, thereby constructively amending his petition for post-conviction relief. Therefore, we find the issue has not been waived, and should be analyzed within the legal framework of a claim of ineffective assistance of counsel.

### II.    Ineffective Assistance of Counsel

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v.*

*State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998).

The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

### a. Waiver of Jury Trial

The petitioner contends that he received ineffective assistance of counsel because he did not "fully understand the consequences and advantages" of his waiver of the right to a jury trial. The petitioner argues, therefore, that his waiver was made unknowingly and unintelligently. The State contends the petitioner failed to meet his burden.

The record reflects the petitioner voluntarily, intelligently, and knowingly signed the waiver of a jury trial. At the evidentiary hearing, trial counsel testified that he advised the petitioner on all of his options regarding his case. Trial counsel also testified that he and the petitioner discussed the strategic advantages of a bench trial in his particular case. The petitioner's testimony was also corroborated by Mr. Mason. Mr. Mason testified that they discussed the "pros and cons" with the petitioner "at length." In addition, the petitioner's signed waiver stated that he "has been advised by counsel."

Implicit in the post-conviction court's order denying relief is an accreditation of the testimony of both trial counsel and Mr. Mason, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.3d at 500. Furthermore, the petitioner has failed to establish how he was prejudiced by having a bench trial versus a jury trial. The petitioner, therefore, is not entitled to relief on this issue.

### b. Failure to Investigate Potential Witnesses

The petitioner alleges trial counsel was ineffective for failing to investigate potential witnesses, Mr. Overstreet and his girlfriend. The petitioner claims that their knowledge of the incident "could have provided support to resolve the conflicting accounts of events in this case." However, as the State has noted, the petitioner failed to present any testimony from Mr. Overstreet or his girlfriend at his post-conviction hearing. While the petitioner speculated on what the potential witnesses saw that night, no testimony was presented from either witness.

To establish a claim for ineffective assistance of counsel for failure to investigate and present testimony from a witness, the petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, the trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." *Denton v. State*, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "It is elementary that

neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Black*, 794 S.W.2d at 757.

Here, the petitioner failed to call Mr. Overstreet or his girlfriend as witnesses at his post-conviction hearing. Accordingly, he has failed to present sufficient evidence that trial counsel's performance was deficient on this issue and cannot meet the first prong of the *Strickland* test. Furthermore, because the petitioner failed to present the witnesses at the evidentiary hearing, he cannot establish prejudice. *See Black*, 794 S.W.2d at 757-58. The petitioner is not entitled to relief on this issue.

### c. Failure to Challenge Expert's Qualifications

The petitioner asserts trial counsel was ineffective for failing to challenge the qualifications of the State's expert witness during trial. The testimony of trial counsel at the post-conviction hearing indicated that he was aware of Ms. Crues' qualifications as an expert and that she had previously testified as an expert several times. The petitioner testified that while he wanted trial counsel to "do something more," the witness was qualified to be an expert witness.

In its order denying relief, the post-conviction court found that trial counsel's decision was "reasonable and professional" and concluded that the petitioner failed to "establish deficient performance." Nothing in the record preponderates against this finding. Moreover, the petitioner has been unable to establish any resultant prejudice. As the post-conviction court noted, the expert did not offer testimony that a rape had occurred, only that there had been sexual contact between the petitioner and the victim. Because that testimony was in alignment with the defense's theory of the case, there can be no prejudice to the petitioner. This issue is without merit.

### d. Failure to Object to the Expert's Opinion on the Ultimate Issue

The petitioner claims trial counsel was ineffective for failing to object during the State's expert's testimony concerning the ultimate issue—whether the petitioner had raped the victim. However, at the evidentiary hearing, trial counsel testified that, in fact, he did object to Ms. Crues' testimony "to make it clear that there is no way of knowing" whether the sexual contact had been consensual or rape, and that objection was overruled by the trial court. The post-conviction court found that Ms. Crues did not render an expert opinion on the ultimate issue, and therefore, the petitioner's claim was unsubstantiated. The petitioner has failed to present any evidence to establish deficient performance or resulting prejudice and is not entitled to relief on this issue.

**d. Failure to Challenge the Authenticity of the Rape Kit**

The petitioner alleges trial counsel was ineffective for failure to challenge the authenticity of the rape kit at trial. The State contends the petitioner has failed to meet his burden. At the evidentiary hearing, trial counsel testified that he did not challenge the authenticity of the rape kit, because that would have been contrary to the defense's theory of the case, that consensual sexual contact did occur. The post-conviction court accredited that testimony and concluded that there was "no proof that suggests this decision fell below an objective standard of reasonableness." Nothing in the record preponderates against that finding. *See Tidwell*, 922 S.W.2d at 500. Further, the petitioner has offered no argument or evidence of prejudice. Therefore, the petitioner is not entitled to relief on this issue.

**e. Failure to Impeach Testimony of Witness**

Lastly, the petitioner claims trial counsel was ineffective for failing to impeach Ms. Overstreet concerning her trial testimony that she rode to the hospital with the victim even though a police officer testified that he took the victim to the hospital alone. The post-conviction court found that the petitioner failed to present any proof or argument at the evidentiary hearing on this issue, and therefore, failed to establish deficiency and prejudice. Additionally, trial counsel's testimony indicated that he believed that portion of Ms. Overstreet's testimony did not "carry any weight on what actually happened." The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE

- 13 -